v. United States And then, you know, I'll have to ask you a question. Would you argue that what occurred during this interim period, this nearly five-year period at this point, is a temporary physical taking? It would be a taking of their property for the period of time they were excluded from it, yes. So they would be Not regulatory though. You think it should be analyzed Oh, absolutely not regulatory. During the per se physical takings. Correct. They had been physically excluded from the use of their property for that time. It's no different than, say, Kindle Laundry, which was discussed in the Supreme Court, one of those cases where we talk about a period of time where the owner is dispossessed of their property or property rights, certainly they're entitled to compensation for that period of time. Mr. Herb, what property right is taken by the government when the NITU is issued? Certainly. The property rights are essentially all property rights that the LADD family has as the fee under Arizona law, when the railroad stops railroad use of this easement. So under Arizona law But the railroad technically doesn't stop railroad use when the NITU is issued? On the facts of this case, it certainly did. If the railroad line washed out in 2005, the tracks and ties have been removed. That may be the case, but legally speaking, there's no abandonment until there's approval given and the abandonment is consummated. In this case, the STB did approve the cessation and abandonment of railroad use. At some subsequent point, what I'm trying to get at is what right at the time the NITU is issued is taken by the government? The right of the LADDs and their neighbors to get on their land, to grade their land, to excavate their land, to exclude others from their property, to fence their land, to incorporate this property into their ranches the same way they would have under Arizona law. But their property was subject to an easement the day before the NITU issued and it's still subject to an easement the day after it issued, correct? If you extract the Federal Trails Act from this equation and it was decided just under Arizona law, at some point before 2006, the LADDs could have gone into court in Arizona and said if the railroad tried to still exclude them and could have filed a quiet title suit and would have won that quiet title suit. Yes, but the Rails to Trails Act is in place and it talks about rail banking. We'll keep this as a trail in case we ever need to use it as a railroad again, thus kind of linking the trail use to the railroad use. How do you deal with that? Well, that's a Federal effort to redefine the state property rights and as you noted in your concurrence in the Purcell case, when the Federal Government certainly is free to redefine property rights, but in doing so, they owe the owner compensation because they've changed the rights that these property owners had under state law when the STB invoked the 1247D. It speaks to land. It speaks to who owns and what the rights are in the land. It's not about regulating the railroad. So when the STB issued that, what they did is they redefined the LADDs property rights under Arizona law, deprived them of their use. They can't even file a quiet title suit and so at this point, they have lost the use of their land. For whatever period of time this continues and at this point, it appears perpetual. Suppose tomorrow the railroad decided it was going to reinstitute service and put down tracks along those corridors. Would they be entitled to do that? They would be entitled to do so only because of the Trails Act, not because of any provision under Arizona law. The railroad lost whatever right they had and if we take the Federal Trails Act out of it, the railroad lost whatever right it had to use this land as a matter of Arizona law when they ceased railroad use, when they removed the rails and ties and when they had permission to abandon railroad service. So not when they removed the rails and ties, but when the NITU issued? There would be a series of events that show under Arizona law that the railroad abandoned and lost any interest in right to use this property. Those would include removing the rails and ties. Those would include the affirmative actions. But that causes me pause because you're arguing the NITU is the trigger, but suppose at the point yet. So then you wouldn't have a taking as of the time of the NITU because the railroad would still have a legitimate easement until it pulled up those tracks. Well, this Court's held that you would still have a taking even in that event if the railroad were still using it. That's the Barclay decision, where the railroad was still using it. I know this Court held that, but that really isn't consistent with the logic that you're explaining to us, which is that the trigger really ought to be when the railroad packs up and goes home. Well, what you're looking at is an interface between federal law, what the federal rule is, and what state law is under Arizona law. What are the property interests defined by Arizona law? When we look just to Arizona law, when you find when the railroad packs up and goes home, removes the tracks and ties, then the lads own that land free of any burden of an easement. Now federal law changes that, and that's where the NITU comes in. So the STB has to consummate the abandonment before there's an abandonment? The STB prevents an abandonment from occurring when they issue the NITU. They preempt that state law. They destroy those state rights, and that's the takings event. Even if, in some cases like Barclay, the railroad was still using it, this Court has held we don't need to resolve the abandonment issue to decide liability, because what happened is, what was taken wasn't just a physical possession of the land, but they took the property interest by redefining it. You started out by telling us Judge Hodges erred by not following the NITU rule. As soon as the NITU issued, that was the accrual date. What if the NITU doesn't actually delay the consummation of the abandonment? The NITU's issued, there's obviously going to be a delay until the Surface Transportation Board actually gets everything prepared for abandonment. What if the NITU doesn't delay that? Is there still a temporary taking? Well, the NITU, what that did, is that for whatever period of time, the railroad is actually the beneficiary of this. The railroad gains an interest to either sell or donate in the land. I'm asking you to reconcile the conflict in your own arguments. You either get to choose the consummation point or the NITU point. You started out with the NITU point, and you've kind of been switching to a different point, the point at which the railroad tore up its tracks. Which is it? It is definitely the NITU point. That's what the law of this court is. When I talk about tearing up the tracks, I was referring to the principles of state law, which are different. The NITU prevents that state law from ever coming into play. So that is definitely the taking occurs when the NITU is issued. And to the extent we consult state law, that is just simply showing what was taken, what the federal law preempted that would have been the rule under Arizona state law. And this point is one that the NITU is the taking. Even when a trail is not yet physically built on the land, it's been recognized by Solicitor General, now Justice Kagan, when she wrote, it's true that under Caldwell, landowners may seek compensation for the alleged taking immediately upon issuance of the NITU, even though the trail use agreement is not reached. And no taking may later be found would only have been temporary. But even without the NITU, doesn't the Surface Transportation Board control when consummation of the abandonment occurs? They do control the railroad's ability to cease railroad service and abandon railroad service. And in this case, they granted the railroad the authority to abandon railroad service on it. That's under 49 U.S.C. 10903. So those requirements were satisfied. The STB, in fact, this was a contested abandonment proceeding. The railroad wanted to abandon. But even if the railroad wants to abandon, it has to get permission from the STB, doesn't it? Correct. And the STB gave them permission. Not only did it give them permission, it found in their order that public use and convenience justified the cessation of this track. It's at the NITU. Is that what you're talking about? That when they granted the permission, that was in the NITU? Both in the NITU and in prior, the prior proceeding by the STB. It was where they granted the exempt abandonment. It was a contested abandonment, as I mentioned, where the railroad was granted the authority to remove their tracks and ties and take this corridor out of railroad service because the STB made an affirmative factual finding. We don't need this for railroad service anymore at that point. The fundamental error of Judge Hodges puts these landowners in a trick bag. And the trick bag is this. The rule is very clearly announced in Caldwell and Barclay that their statute begins to run in July 2006. We're now almost going on four and a half years later than that. The railroad has already been granted additional consummation time to consummate this abandonment through July of 2011. And it's likely that they would be, if they requested, be granted again. And the STB has a policy of granting these to allow the prospect of trail use. So in that case, we are in a situation where they don't know when they could bring their claim. And they have been denied use of their land. Do you want to save the rest of your rebuttal time, Mr. Perrin? Thank you. I'm scared. Jack, Your Honor. Jack, thank you. May it please the Court. In Tahoe Sierra, the Supreme Court said that physical appropriations are relatively rare, easily identified, and usually represent a greater affront to individual property rights. As a result in Tahoe, the Court reiterated that there is a bright line that exists between physical takings and regulatory takings. Despite this bright line... The way I think of this, and maybe you could correct me, is a regulatory taking will take some share, some part of the enjoyment of the property, whereas the physical taking takes the whole thing. And you have no ability to enjoy any share of your property rights. Isn't that what happened here? No. They can't even step on that land without trespassing, right? Two things. First, with respect to their ability to access, as we stand here today, that is not as a result of the issuance of the need to. Stick with the question, is this physical or regulatory? A regulatory will take various uses or various aspects of the enjoyment of property, whereas the physical taking takes the whole thing. Isn't that what happened here? No, I don't think so, because in Loretto, Your Honor,  Yeah, but they dropped something on the property and you lose that entire piece of property, wherever it was. No, the property itself, an apartment building, continued to be used as a rental apartment building. There was only a small physical intrusion on the property. Yes, and that was a damages issue as to how much of the whole thing was taken, and it may be little or great, but the whole thing was taken, at least as to the respect of that wire. Well, and I hear, I don't think the whole thing has been taken. As I said, What can they still enjoy about their property? They enjoy a fee interest in that property, even today. And so they can go on and build a house there, or they can decide to put a firing range there or something? They enjoy a fee interest burdened only by the railroad's right to run a railroad. That was the pre-existing situation before the Me Too. That's the same situation today. What's the argument you made unsuccessfully with the Supreme Court where Justice Scalia seemed to actually make fun of you? I mean, I don't think that's going to work on us at this point. You can't say, oh, yeah, well, they didn't lose anything because they didn't have anything the day before. They did have something, and they still have something today, and that is the fee interest in the property. That has not changed. There's no chance to enjoy that at all in any way. Why? Back to the Scalia argument, that was pretty well disposed of, wasn't it, in Perseu? Well, I think in Perseu, and I think if you look at this court's ruling in Perseu, and it talks about whether the action under the 1920 Transportation Act, for example, constituted a physical taking, and this court in Perseu said no, and a delay in the ability to abandon, as is provided, as the court was pointing out in the questioning of Appellants, is provided under the 1920 Transportation Act, and it's also provided under the Trails Act. But both of those, the delay of the right to enter the property, the delay in the use of the property, has to be judged as a regulatory taking, and that was specifically spelled out in Perseu. In fact, the language the court— Well, any physical invasion is a physical taking. A railroad running through your backyard is a bit of a physical invasion, isn't it? Yes, it is. Then this is a physical taking, and it hasn't changed. You just told us that. They still have that right. They still can invade, and so it's physical, right? But that right is not granted by the need to. It's granted by the railroad's acquisition of a property interest in that property 100 years ago. As I understand, you're arguing that Caldwell and Barclay only set forth a rule for accrual, not for when the taking, or whether the taking, occurs. Is that right? That's right. Well, then you could have a circumstance where the NITU is issued, and then over six years later, the abandonment occurs, and the landowner is left between a rock and a hard place. Well, I think there are a couple— It files within the six-year statute, and a taking hasn't yet occurred. If it waits until the taking occurs, the statute of limitations has told. How can that be? Well, I think there's a couple of things to say about that, Your Honor. First is that, and many of the trial courts have begun to look at this option of staying claims where a NITU has been issued, but no final consummation of an agreement for trail use has been found, to allow for the facts to develop to the point of determining whether or not we should evaluate these as regulatory facilitations. But that sort of assumes that your view of the law is correct and then crafts some sort of a rule to react to it. But my question is whether your interpretation of the law is flawed in the first instance. Well, I think Cogwell and Barclay tells us that there is a bright-line rule as to the accrual of a claim, and it is upon the issuance of the NITU. Isn't that when the taking occurs? How can you separate the two? That's really what I'm getting at. It is the point at which the taking occurs. The question is, at the moment, is it regulatory or physical? And Cogwell even himself says, at the time that the NITU issues, we may not know what type of taking we have. No, it doesn't say we may not know the character of the taking. It says we may not know whether the taking is temporary or permanent. It's quite clear about that. There's a difference between saying Cogwell raises a question of whether it's physical and regulatory. It does not. It raises the question of whether it's temporary or permanent. But there is also language in Cogwell that says the issuance of a NITU begins one of what may be many outcomes, not just two, whether it's temporary or whether it's permanent. I think that Cogwell Court indeed anticipated that there would be other options available in terms of whether a taking would occur and how you would judge it in terms of character and duration. But there's nothing in Cogwell that suggests that whatever other option might be left open is considered a regulatory taking. The Cogwell Court certainly never says that a regulatory taking may be something that a future court would have to consider. It wasn't faced with that situation because it had a trail that had been established in that case. A regulatory taking and a physical taking would be two entirely different causes of action, correct? They would be two different causes of action. Yes. A regulatory taking and a physical taking are two very different things, as you've argued to us. They are very different things. So why would a temporary taking start the clock ticking for the statute of limitations on what ultimately is a physical taking? You're arguing the NITU begins a regulatory taking. So how could that mark the start of a statute of limitations for what ultimately becomes a physical taking when a trail is built? I think in my mind, Your Honor, it works the same way as whether it's permanent or temporary. Whether it's permanent or temporary, it starts upon the same day. Well, permanent and temporary has to do with duration of time. So, of course, the passage of time is relevant. But whether it's physical or regulatory are two different causes of action. It's two discreetly different causes of action to be analyzed under two entirely different bodies of law. You've argued this to us, so you can't disagree with it. And so if that's the case, then how could this regulatory taking start that statute of limitations clock? It can't. The statute of limitations doesn't begin until the cause of action arises. Well, and if the cause of action is a physical taking and that only occurs upon entry onto the property, then you are back to the situation where Caldwell and Barclay are incorrectly decided. I don't think you have to go there. I think that you can harmonize these. I think you have a situation where a taking... It's the government's position that Caldwell and Barclay are incorrectly decided. They weren't your position to begin with. I've read every brief going back, and I'm surprised Ms. Kovacs didn't argue because she was on all the briefs going back. So, you know, clearly this was not the government's choice of positions from the outset. Does the government believe that it's wrong today? I think that the government has accepted that it is the position of this court that the Me Too establishes a bright line, a time point for the commencement of a takings claim. We don't believe that it defined the exact nature of that takings claim. Can I ask you to respond to something from Caldwell? The Me Too marks the finite start to either temporary or permanent takings by halting abandonment. Just reading directly from the case. So you halted abandonment, and it started the permanent or temporary taking. Right? That's correct. It halted abandonment and thereby placed a restriction on the lad's potential use of this property. But it did not appropriate a new property interest to some other party. It did not appropriate a new property interest to the government. The government has no interest in this property to use it for its own benefit. There's no third party that was granted a benefit or a right to use this. There's no new easement that's been placed on this property. The government's converted a railroad into a park, right? Not in this case. Well, what's going on then? You tell me what's going on. What's going on is that the railroad has not yet decided whether it wants to give up the right to continue to run railroads over this line at some point. In fact, if we look at the two stretches of this railroad, we have the northern stretch and the southern stretch. The southern stretch that the railroad no longer has an interest in, it has fully abandoned its interest. And to the extent that the lads and their other property owners have an interest in that property, all easements have now been lifted, and they own that property clear. On the northern stretch, the railroad still desires, at some point in the future, to potentially run trains that would connect to Mexico. Without banking, the potential to run trains, they're not currently running trains. The track is washed away and gone. So their easement is not preserved. The easement was for while they were operating railroads. It's not for their desire in the year 3000 to maybe put some more track down. They don't get to hold it that whole time in perpetuity. One fundamental thing I'd like to say, and I'll get then to the question, is that we, of course, dispute that there is only an easement. We presented evidence before the trial court that these were easements. So for purposes of this hearing, it's an easement. So if it's an easement, the reason that it has not lapsed and that it has not reverted back to the property owners is not because of the NITU. It's because of the 1920 Transportation Act. You know, I keep waiting for you to tell me the facts as I understood them, which is the NITU failed. No trail's going to be built. It won't be built. It can't be built now. Everybody's given up on that. And so eventually this land will revert, and they will own the land. And this is just a question of how much the damages are, which may be slight because you've limited their enjoyment for a period of time. But you don't argue that.  I'm puzzled. We argue that it needs to be analyzed as a regulatory taking because the limitation here, there was no new appropriation of this property. The government, you have to look at the nature of the government action with respect to the property. The court has told us in Tahoe Sierra, you can't look to the impact it has on the party. You have to look at the nature of the government action. Was it the nature of the government action to appropriate an interest to itself for its own benefit? Running trains through my backyard isn't taking my backyard. Running trains on that corridor is a result of the property interest that was acquired by the railroads a hundred years ago, not because of the NITU. The NITU does not instruct the railroad. But they're not running trains now. They're holding the land in abeyance while they negotiate to see if they can get trail use. No, they're no longer negotiating. The NITU has lapsed. There is no NITU on this property. It's over. The only reason they cannot go on that property today is because under the 1920 Transportation Act. You may want to run a railroad again, and yet you're telling me running a railroad is not a physical invasion. It is a physical invasion by the railroad as a result of the property interest it owns as a result of the acquisition of that property interest a hundred years ago, not because of the NITU, and even not because of the 1920 Transportation Act. Except that the NITU triggered the reversionary interest which gave them their property back. And now you're taking it a second time. You're saying, yes, you got your property back, but now we may want to run a railroad again. And so if you run a railroad again, that's a physical invasion, isn't it? Because they have their property back. It's a physical invasion by the railroad as a result of the easement it owns, not because of the government, not because of an instruction we've given them, and not because of right we've given them. I just read that, remember, the NITU halts the abandonment and triggers the taking. How do you get around that? As I think we've presented, Your Honor, I think it's because there is a bright line here between a physical and a regulatory taking. The limitations on the use of the property, it did not appropriate a new interest in the property for the government. Thank you, Your Honor. Thank you, Mr. Jett. Mr. Hearn, you have a little less than four minutes. Yes, Your Honor. Tomorrow, a new NITU could be issued and a trail could be created. The railroad can and still is. That's the reason that they have agreed to extend their time for filing a notice of consummation of abandonment. Because the STB says they extend that to allow the possibility of trailers. In Barclay, the NITU by which the trail was created was the successor NITU after the original NITU negotiating period ended. During the trial before Judge Hodges, we asked the government, will you stipulate that no trail can ever be built on this property now that the original NITU negotiating period is over? And they couldn't and wouldn't because 49 CFR 1152G, the regulations the STB has adopted that govern what they do, simply and clearly state, even if the original NITU is over and the negotiating period expired, we will still grant a new NITU to create a new trail. So I don't know, nor do my clients know, whether there will or won't be a trail. They do know this, that they do not have access to their property. They do not have the use of their land. They do not have the ability to exclude others. This is not a regulatory taking. They have been physically ousted from the possession of their land. The government destroyed their property interest that they enjoyed under Arizona law. And that is a taking, a per se taking. The Supreme Court has so held in the Armstrong case where a order of the government destroyed lien rights. It held so in U.S. v. Security Industrial Bank where a government order that destroyed the value of private property is a per se compensable taking. That's what's going on here. It is the only thing the railroad has to negotiate with is what they got from the STB. This railroad has nothing to negotiate or would have no interest to negotiate the sale or giving to another party under Arizona law. So if the federal government took it from my clients, gave it to the railroad, the federal government under the Fifth Amendment must compensate them for that interest that it has taken. Is the government action here in issuing the NITU anything more than simply a mechanism that in the circumstances of this case affects a delay in when the property owners could be free of the easement that they had when they purchased the property? The issuance of the NITU, pursuant to the Trails Act, 16 U.S.C. 1247D, is the event, and the prior holdings of this court have so held, is the event. But it could be here that, for example, the railroad decides it's going to resume use for the northern section or the southern section? I forget which one. The one where the abandonment has been consummated. Correct. The portion segment east of Naco at the border of Mexico has been consummated, that small segment about 20 miles out of 75. So the other part of the track is still sort of hanging in limbo, right? Limbo in a federal regulatory sense, in the sense that my clients can't use their property, the railroad still has the ability to sell it to a trailer, or they could reactivate railroads. So if the railroad does reactivate and resumes operation as a railroad, then the easement that your clients had before the NITU existed would remain on the property for, the balance of the time could be forever that the railroad operates as a railroad, right? The easement would have ended under Arizona law. So we're talking about, under my set of hypothetical facts, we're talking about simply a delay. But for the NITU and the Rail-to-Trail Act, then your clients arguably could have gotten their property back free of this easement, but instead the easement remained on the property. But it was the same easement that was on the property before. So it wasn't, there was nothing taken from them in the sense that there's a different easement. I would disagree with that, Your Honor, in this way. The issuance of the NITU changed the character of the easement as well, because the easement was one for operating trains across their property. When the NITU was issued, that then gave the railroad the ability to negotiate the sale of this to a non-railroad for a non-railroad use. So you're saying it's not just a delay. It's something quite different and amounts to a physical taking because it's an encumbrance upon whatever property right they have. Exactly, and it substantially redefines that property. Thank you, Your Honor. Thank you, Mr. Hearn.